UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

ROBERT HENDRICKS,

                  Petitioner,

        vs.

MARK BRADT,[1] Superintendent, Elmira
Correctional Facility,

                Respondent.

No. 9:07-cv-00011-JKS

MEMORANDUM DECISION

Petitioner Robert Hendricks, a state prisoner appearing *pro se,* has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Hendricks is currently in the custody of the New York Department of Correctional Services, incarcerated in the Elmira Correctional Facility.

## I.  BACKGROUND/PRIOR PROCEEDINGS

In November 1999 Hendricks was convicted after a jury trial in the Oneida County Court of two counts of Murder in the Second Degree [N.Y. Pen. Law § 125.25(1), (3)], two counts of Robbery in the First Degree [N.Y. Pen. Law § 160.15(1), (2)], and Criminal Possession of a Weapon in the Fourth Degree [N.Y. Pen. Law § 265.01(2)].  Hendricks was sentenced to an indeterminate term of 25 years to life on each murder count, a determinate term of 25 years on each of the robbery counts, and a one-year term on the weapons count; all terms to be served concurrently.

Hendricks, appearing through counsel, timely appealed his conviction to the Appellate Division, Fourth Department, which affirmed his conviction on February 11, 2004, and the New York Court of Appeals denied leave to appeal on May 10, 2004.[2]  Hendricks, appearing through

---

[1] Mark Bradt, Superintendent, Elmira Correctional Facility is substituted for John Burge, Superintendent, Elmira Correctional Facility.  Fed. R. Civ. P. 17(d).

[2] *People v. Hendricks*, 771 N.Y.S.2d 440 (N.Y. App. Div), *lv. denied*, 814 N.E.2d 471 (N.Y. 2004).

counsel, filed a motion to set aside the verdict under N.Y. Criminal Procedure Law § 330.30 in the Oneida County Court, which denied his motion on November 18, 1999. In February 2003 Hendricks, appearing through counsel, filed a motion to vacate his conviction under N.Y. Criminal Procedure Law § 440.10 in the Oneida County Court, which summarily denied his motion on procedural grounds. Hendricks sought leave to appeal the denial from the Appellate Division, Fourth Department, which granted leave and affirmed the decision on February 11, 2004, and the New York Court of Appeals denied leave to appeal on May 10, 2004.[3]

On June 30, 2005, Hendricks, appearing *pro se*, filed a second CPL § 440.10 motion to vacate his conviction in the Oneida County Court. The County Court denied the motion in a written opinion, and the Appellate Division denied leave to appeal on November 8, 2006. On July 16, 2005, Hendricks also filed a petition for habeas relief under 28 U.S.C. § 2254 in this Court, which was dismissed without prejudice on November 17, 2005, to permit Hendricks to exhaust his claims.[4]

Hendricks filed his petition for relief in this Court on December 19, 2006 (file stamped January 4, 2007).

## II. GROUNDS/DEFENSES

In his petition Hendricks raises three grounds: (1) *Brady*[5] violation for failure to disclose a statement made by an individual, Paul Roberts, during the police investigation who was not called as a witness at trial and false testimony by the investigating officer at trial; (2) *Brady* violation for failure to disclose a statement of another individual, Emmanuel Clothakis, who did not testify at trial; and (3) evidence of prior bad acts (uncharged crimes) was improperly admitted (*Ventimiglia*[6] violation).

---

[3] *People v. Hendricks*, 771 N.Y.S.2d 441 (N.Y. App. Div), *lv. denied*, 814 N.E.2d 471 (N.Y. 2004).

[4] *Hendricks v. Superintendent Calvin West*, 2005 WL 3097898 (N.D.N.Y. November 17, 2005).

[5] *Brady v. Maryland*, 373 U.S. 83 (1963).

[6] *People v. Ventimiglia*, 420 N.E.2d 89 (N.Y. 1981) (procedure under New York law to determine admissibility of evidence of prior crimes).

Respondent concedes that all claims have been exhausted, but alleges that the petition is time-barred by the one-year limitation period of AEDPA.  Respondent also contends that Hendricks' second and third grounds are procedurally barred.

### III.  STANDARD OF REVIEW

Because Hendricks filed his petition after April 24, 1996, it is governed by the standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  Consequently, this Court cannot grant relief unless the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[7]  The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision.[8]  Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"[9]  When a claim falls under the "unreasonable application" prong, a state court's application of the Supreme Court precedent must be "objectively unreasonable," "not just incorrect."[10]  The Supreme Court has made clear that the objectively unreasonable standard is a substantially higher threshold than simply believing the state court determination was incorrect.[11]  Finally, in a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of

---

[7] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405–406 (2000); *see Lockyer v. Andrade,* 538 U.S. 63, 70-73 (2003) (explaining this standard).

[8] *Williams v. Taylor*, 529 U.S. at 412.

[9] *Carey v. Musladin*, 549 U.S. 70, ___, 127 S.Ct. 649, 654 (2006) (alterations by the Court); *see Wright v. Van Patten*, 552 U.S. ___, ___, 128 S.Ct. 743, 746-47 (2008) (per curiam).

[10] *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003).

[11] *Schriro v. Landrigan*, 550 U.S. ___, ___, 127 S.Ct. 1933, 1939 (2007).

constitutional error in a state-court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[12]

In applying this standard, this Court reviews the last reasoned decision by the state court.[13]  In addition, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[14]  If a federal claim has not been adjudicated on the merits, AEDPA deference is not required.[15]  In that situation, conclusions of law and mixed questions of fact and conclusions of law are reviewed *de novo*.[16]  A state court decision is conclusively presumed to have been on the merits when the state court disposes of the claim on other than procedural grounds, even where it fails to provide any reasoning for the disposition.[17]  Where there is no reasoned decision of the state court addressing the ground or grounds raised by Hendicks on the merits and no independent state grounds exist for not addressing those grounds, this Court must decide the issues *de novo* on the record before it.[18]

To the extent that Hendricks raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding.  It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.[19]  A federal court must accept that state courts correctly applied state laws.[20]  A petitioner

---

[12] *Fry v. Pliler*, 551 U.S. ___, ___, 127 S.Ct. 2321, 2328 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)).

[13] *Jones v. Stinson,* 229 F.3d 112, 118 (2d Cir. 2000).

[14] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[15] *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir. 2003).

[16] *DeBerry v. Portuondo*, 403 F.3d 57, 67 (2d Cir. 2005).

[17] *See Jimenez v. Walker*, 458 F.3d 130, 145–46 (2d Cir. 2006), *cert. denied*, 127 S.Ct. 976 (2007) (Mem).

[18] *See Spears v. Greiner*, 459 F.3d 200, 203-04 (2d Cir. 2006).

[19] *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).

[20] *Bell v. Cone,* 543 U.S. 447, 455 (2005); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (it is presumed that the state court knew and correctly applied state law) *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

may not transform a state-law issue into a federal one by simply asserting a violation of due process.[21]  A federal court may not issue a habeas writ based upon a perceived error of state law unless the error is sufficiently egregious to amount to a denial of due process under the Fourteenth Amendment.[22]

## IV.  DISCUSSION

The Facts are well known to the parties and, in the interests of brevity are set forth herein only to the extent necessary to an understanding of the decision of the Court.

Hendricks, together with his co-defendant, was convicted of the murder of David Hall, a bartender at the Top Spin Tavern, and the robbery of Top Spin in the early morning hours of January 8, 1999.

A.     **Timeliness**.

The New York Court of Appeals denied leave to appeal on May 10, 2004.  Hendricks' conviction became final 90 days later, Monday August 9, 2004, when his time to petition for certiorari to the Supreme Court lapsed.[23]  Absent tolling, Hendricks had until one year later, August 9, 2005, to file his petition for relief in this Court.[24]  He filed his first post-conviction motion for relief in the state courts on June 30, 2005, at which point 325 days of his 365 days had lapsed.  The time was statutorily tolled for the period his state court post-conviction CPL § 440.10 motion was pending, through November 8, 2006.[25]  At that point, absent additional tolling, Hendricks had 40 days, until Monday December 18, 2006, within which to file his petition in this Court.  Hendricks filed it on December 19, 2006, one day late.

Hendricks contends he is entitled to equitable tolling for the period December 12 through December 18, 2006.  To warrant equitable tolling, a petitioner must show "(1) that he has been

---

[21] *See Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002).

[22] *See Pulley v. Harris*, 465 U.S. 37, 41 (1984).

[23] *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001).

[24] 28 U.S.C. § 2244(d)(1)(A).

[25] 28 U.S.C. § 2244(d)(2).

pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."[26] Equitable tolling is applied only under rare and exceptional circumstances,[27] and the party seeking equitable tolling must have acted with reasonable diligence throughout the entire period sought to be tolled.[28]  The Second Circuit has established only a limited number of circumstances that may merit equitable tolling, e.g., where an attorney's conduct is so outrageous and incompetent that it is truly extraordinary,[29] or where prison officials intentionally obstruct a petitioner's ability to file his petition by confiscating his legal papers.[30]  Equally as important is that a petitioner is required "to demonstrate a causal connection between the extraordinary circumstances upon which to demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances."[31]  If reasonable diligence is not exercised in attempting to file after the extraordinary circumstances began, the link of causation between the extraordinary circumstances and the failure to file is broken, and the extraordinary circumstances did not prevent timely filing.[32]  The limitations period is tolled for a period, beginning on the date the extraordinary circumstance occurred, that is equal to the length of time between (i) the date on which filing ordinarily would have been required under the applicable limitations period and (ii) the earliest date after the extraordinary circumstance occurred which that petitioner, acting with reasonable diligence, should have filed his or her petition.[33]

---

[26] *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *Diaz v. Kelly*, 515 F.3d 149, 153 (2d Cir. 2008).

[27] *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (per curiam).

[28] *Id.*

[29] *Baldayaque v. United States*, 338 F.3d 145, 152 (2d Cir. 2003).

[30] *Valverde v. Stinson*, 224 F.3d 129, 133–34 (2d Cir. 2000).

[31] *Id.*, 224 F.3d at 134.

[32] *Id.*

[33] *Id.*

In his traverse, Hendricks states that on December 12, 2006, he was going to the correctional facility's notary to have an affidavit he intended to submit with his petition notarized. According to Hendricks, under facility policy he was required to go to the notary after lunch, and he took his papers with him to lunch in a folder but was prevented by policy from taking them into the mess hall. Hendricks placed the folder down, and when he went to retrieve them they were missing. He then requested replacement copies of his court papers from home, and it took him six days to receive the copies form home. He filed the very next day.[34]

Losing papers as described by Hendricks may be somewhat unusual; it does not, however, constitute "extraordinary circumstances" required for equitable tolling. The facts in this case constitute nothing more than mere negligence on the part of Hendricks in failing to properly safeguard his papers. While prison policy may have contributed to the circumstances surrounding the loss of the papers, that does not relieve Hendricks of the responsibility to ensure that his important legal papers are adequately safeguarded. A responsibility that Hendricks failed to fulfill.[35]

Hendricks is not entitled to equitable tolling for the period December 12 through 18, 2006. The petition is dismissed as untimely.

B.      **Merits**.

Even if the Court were to reach the merits of his petition, Hendricks would not prevail.

Ground 1:  *Brady* Violation (Roberts Statement) and False Testimony.

Hendricks contends that in failing to disclose the existence of and to turn over a statement made by Paul Roberts on the day of the crime violated *Brady v. Maryland*, and that his due process rights were violated when the investigating officer, Sgt. Brady, falsely testified at trial concerning the content of that statement.

It is undisputed that the Roberts statement in question was not disclosed. The record also discloses that Roberts was not called to testify at the trial or, for that matter, at any other time

---

[34] Docket No. 10, pp. 7–8.

[35] The Court also notes that the affidavit Hendricks claims was to be notarized is unidentified, and there is no notarized affidavit appended to the petition Hendricks ultimately filed untimely.

MEMORANDUM DECISION
*Hendricks v. Bradt*, 9:07-cv-00011-JKS                    7

during the criminal proceeding.  Hendricks raised this issue in his first CPL § 440.10 motion,
which the Oneida County Court denied on procedural grounds, N.Y. Criminal Procedure Law §
440.10[2](b), which requires denial of a 440.10 motion when "the judgment is on appeal, and
sufficient facts appear on the record with respect to the ground or issue raised upon the motion to
permit an adequate review thereof upon such appeal."  The Appellate Division granted leave to
appeal and affirmed the decision of the Oneida County Court, holding (441 N.Y.S.2d 441):

> Defendant contends that the People withheld a statement in violation of their
> obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.
> We agree.  However, because "there is no 'reasonable probability' that the verdict
> would have been different had the material been disclosed to the defense and
> presented to the trier of fact," reversal is not required (citation omitted).

 *Brady* and its progeny require the Government to disclose material information that is
"favorable to the accused, either because it is exculpatory, or because it is impeaching."[36]  A
*Brady* violation occurs only where there is a "reasonable probability" that a different verdict
would have resulted from disclosure of the information that the defendant claims was
suppressed.[37]   That is, "a constitutional error occurs, and the conviction must be reversed, only
if the evidence is material in the sense that its suppression undermines confidence in the outcome
of the trial."[38]

The Appellate Division having found a *Brady* violation, the only issue to be decided by
this Court is whether the Appellate Division erred in determining that the violation was harmless.

Hendricks argues that the Roberts statement undermines the credibility of two prosecution
witnesses:  Richard Hoffman and Sgt. Brady.  Respondent contends that Roberts' statement did
not contain any material evidence that undermined the testimony of either Hoffman or Brady, i.e.,
that it contradicted undisputed evidence and too factually inaccurate to constitute material
evidence.  The Court agrees.

---

[36] *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999).

[37] *Id.,* 527 U.S. at 281.

[38] *United States v. Bagley,* 473 U.S. 667, 678 (1985).

Roberts' statement reads:[39]

At about 2:30 am, On Friday morning, January 8,1999, I was home at 1148 Lincoln aVe.[sic], Utica, N.Y., getting dressed.  I looked out my window after hearing a comotion [sic] outside, and noticed four or five males outside of the Top Spin Tavern, 11152 Lincoln Ave.. [Sic]  There was one black guy and three white guys, and they were yelling and agruing [sic] about something.  I recognized the black guy as one of the owners of the Top Spin and I don't know who the white guys are.  There was a gray car parked outside bar, and a black Ford Explorer parked behind the gray car.  The Explorer is owned by the black guy.  I went to get dressed, and came back out to the front room, went outside and got my papers, and noticed that the males in front of the bar were gone.  The black Explorer was still parked there, along with the gray car.  The other owner named Richie, had his car parked in the parking lot of the funeral home.  It is a maroon colored, Mitsubishi Eclipse.  I didn't see him, but I noticed his car was gone at about 3:00 am .. [Sic]

The white guys were wearing work clothes, jeans and work boots, and they were in their mid thirites [sic] or forties.

Hoffman, the owner of the Top Spin, testified that he left the Top Spin at approximately 6:30 p.m. the evening of January 7 and went home.[40]  He further testified that he did not return until around 10:00 a.m. the morning of January 8 but was not allowed in by the police.[41]  Hoffman was allowed back in the Top Spin sometime in late afternoon.[42]  Hoffman further testified that he owned a maroon Mitsubishi Eclipse.[43]  Hendricks contends that the Roberts' statement contradicts Hoffman's testimony that after he left the Top Spin at approximately 6:30 the evening of the 7th he did not return to the Top Spin until, at the earliest, mid-morning on the 8th, thereby placing Hoffman's credibility in question as well as his whereabouts at the time Hall was shot.

Respondent counters that there are a number of inaccuracies in Roberts' statement, including the fact that there is only one owner of the Top Spin, Hoffman, and he is a Caucasian. Roberts' statement does not unequivocally state that the maroon Mitsubishi Eclipse was present

[39] Docket 6-5, p. 247.

[40] Docket 6-2, pp. 543:23–544:2.

[41] Docket 6-2, pp. 537:21–538:2.

[42] Docket 6-2, p. 529:9–11; 538:3–7.

[43] Docket 6-2, p. 544:3–6.

at about 2:30 a.m., only that he noted it was not there at 3:00 a.m.  More importantly, however, is that Roberts does not claim to have seen Hoffman.  The Court also notes that Hoffman's testimony was directed to a single issue relevant to the case—that there had been a robbery.  That is, Hoffman simply testified to the fact that when he got there late in the afternoon the till was open, there was no money in the till, and the cash bag where the money would usually be put after closing was missing.

Hendricks argues that Sgt. Brady was untruthful in two elements of his testimony concerning his interview of Roberts.  Hendricks raised this issue in his first CPL § 440.10 motion.  In denying the motion neither the Oneida County Court nor the Appellate Division expressly addressed the issue of the testimony of Sgt. Brady.  Accordingly, in the absence of a reasoned decision, this Court must decide the issue *de novo* on the record before it.  Sgt. Brady testified:[44]

> Q.  Were you able to locate any residents of the neighborhood that heard any gunshots that night?
>
> A.  No one heard a gunshot, no, as far as we know.
>
> Q.  And were any residents of the neighborhood, anybody helpful in terms of telling you they saw something at about that time of night?
>
> A.  There was one person that said they saw some people out in front, but they didn't know who they were.
>
> Q.  Did that last person you referred to who said they saw some people out front, did they say how many people they saw out front?
>
> A.  I believe they said three or four.
>
> Q.  Did they give you an approximate time?
>
> A.  About one o'clock, they said.
>
> Q.  Okay.  And did that person indicate to you they heard a gun shot?
>
> A.  No, she said they didn't hear a gunshot.

Hendricks attacks what he considers two discrepancies in Brady's testimony: (1) that Roberts didn't know who the people he saw were and (2) the time as 1:00 instead of 2:30.  As to

---

[44] Docket 6-3, p. 218:2–18.

MEMORANDUM DECISION
*Hendricks v. Bradt*, 9:07-cv-00011-JKS                    10

the first, discrepancy, as noted by the Oneida County Court in denying Hendricks' first CPL §

440.10 motion,[45] Roberts misidentified the black man as one of the owners of the Top Spin.

Whether Roberts actually knew who was the black, anyone familiar with the facts of the

ownership of the Top spin could naturally assume that Roberts more likely than not did not

actually know the identity of the black man.  As for the discrepancy in the time, how this would

undermine his credibility as opposed to his memory for detail is unexplained.

The Court also notes that although the identity and address of Roberts were known to

Hendricks and his appellate counsel since at least February 2003,[46] there is no indication in the

record that Roberts has been interviewed or that any further statement has been obtained from

him.  The burden of proving entitlement to habeas relief is on the party seeking relief.

There is no reasonable probability that the verdict would have been different had Roberts'

statement been disclosed to the defense and presented to the trier of fact.  Nor is there any

evidence from which it may be inferred that Sgt. Brady deliberately gave false testimony or, more

importantly, if he had testified correctly that the outcome would have been different.  Under the

facts and circumstances of this case, this Court cannot say that the decision of the Appellate

Division was "contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court of the United States" or  was "based on an

unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."[47]  Nor can this Court find that the state court unreasonably applied the correct legal

principle to the facts of Hendricks' case within the scope of *Lockyer–Williams*; *i.e.*, the state

court decision was more than incorrect or erroneous, its application of clearly established law

was objectively unreasonable.

Hendricks is not entitled to relief under his first ground.

---

[45] Docket 6-11, p. 3.  There is also indication in the record that the victim, the bartender and only
other person involved in the Top Spin, was also white.  Docket No. 6-10, p. 4, ¶ 6.

[46] See Affirmation of Richard Ferris, Hendricks' trial counsel.  Docket 6-5, pp. 245–247.

[47] 28 U.S.C. § 2254(d).

Ground 2:  *Brady* Violation (Clothakis Statement).

As his second ground, Hendricks alleges that he was never provided with the deposition of Emmanuel Clothakis, as well as two photographic arrays shown to Clothakis.  In his initial deposition Clothakis states he had a conversation with Robert Hendricks, wherein Hendricks allegedly made admissions to the murder.  Subsequently, Clothakis was shown two photo arrays, both of which included the photo of Hendricks' co-defendant Bobbie Hendricks and one that also included the photo of Hendricks.[48]  Clothakis picked out the photo of the co-defendant, Bobbie Hendricks, as the person who had allegedly confessed to him as committing the murder from both arrays.  Clothakis gave as second written deposition in which identified the person who had confessed to him as Bobbie Hendricks, the co-defendant.  Clothakis did not testify at trial.

Hendricks raised this issue in his second CPL § 440.10 motion.  In denying the motion, the Oneida County Court held:[49]

### Defendant's Brady Vio1ation C1aim

The defendant; alleges that his conviction was obtained in violation of his due process right to pretrial disclosure of <u>Brady</u> material.  Clothakis stated that he had a conversation with a person who made admissions about the killing.  In his deposition, he identified the person as the defendant, Robert Hendricks.  After looking at two photo arrays, he stated that the co-defendant, Bobbie Hendricks, made the admissions.  These inconsistent statements made by a person who did not testify at trial are not material.  It does not, in and of itself, compellingly point to the defendant's innocence, much less give rise to reasonable doubt, such that it could be construed to have been capable of changing the outcome of the trial had the jury known of its existence.  See, <u>People v. Valentin</u>, 1 AD3d 982, 983.

### Defendant's Failure to Raise Issue on Appeal

A motion to vacate a judgment of conviction must be denied if there are sufficient facts on the record to have allowed adequate review of the issue on direct appeal but no such appellate determination occurred because defendant unjustifiably failed to raise the issue on appeal (C.P.L. §440.10[2][c]).

It is well settled that a motion to vacate a judgment of conviction cannot be used as a vehicle for a second appeal or as a substitute for a direct appeal.  <u>People</u>

---

[48] Bobbie Hendricks is Robert Hendricks' twin.  Supporting Deposition of Melissa A. Girolamo, Docket 6-20, p. 45.

[49] Docket 6-23, pp. 5–7.

v. Mower, 97 NY2d 239; *People v. Cooks*, 67 NY3d 100; *People v. Kandekore*, 300 AD2d 318.  A motion to vacate a judgment is only available to a defendant who has been wrongfully prevented from taking or perfecting an appeal and where no other avenue of judicial relief is available.  People v. Adams, 12 NY2d 417, 419.

The trial transcript contains the testimony of each trial witness.  The statement of Emmanuel Clothakis and the photo array forms could have been presented to an appellate court as an exhibit.  This defendant has chosen not to raise this issue in the appeal of his conviction.  The defendant's motion to vacate the judgment of conviction is denied because of the defendant's unjustifiable failure to raise such ground or issue upon the appeal perfected by him.  See, C.P.L. §440.10(2)(c).

Respondent contends that Hendricks' second ground is procedurally barred.  Hendricks disputes the Oneida County Court's determination that his motion was barred under CPL § 440.10[2](c).  The Court agrees with Hendricks.  Under CPL § 440.10[2](c), the court must deny a motion to vacate a conviction if there are sufficient facts of record to permit the issue to be presented on direct appeal.  In this case, the state court found that the Clothakis statement could have been presented to the appellate court.  There is no factual finding supporting this conclusion; indeed, the record in this case compels the opposite conclusion.  More specifically, there is no factual finding that either Hendricks, or his counsel, were aware of the Clothakis materials at any time prior to the determination of the appeal, and Respondent points to no evidence in the record that would support an implied finding that either did.  Hendricks' appellate brief is dated July 31, 2003, and the decision of the Appellate Division was handed down in February 2004.  The affidavit of Richard Ferris, the trial counsel, clearly establishes that the earliest he was aware of the Clothakis materials was the first week in September 2004.[50]  In his traverse, as he did in his CPL § 440.10 motion, Hendricks affirmatively contends he did not learn of the Clothakis materials until after his appeal was decided.  Thus, this Court cannot find that Hendricks is procedurally barred from raising the Clothakis material issue before this Court.

---

[50] Docket 6-20, p. 44.

Turning to the merits.  In his initial statement, Clothakis stated:[51]

I asked him what happened with the murder and he said that he didn't even know about the Top Spin bar or what it was, but that he passed it when he went to a weed spot on Lincoln Ave..  I talked with him for a while about this incident and I said to him, "The Police frown on people going around shooting people."  He then said to me "If the fucking cracker had given up the cheese I wouldn't have capped him."  I took this to mean that "If the white guy had given up the money he wouldn't have shot him."  I then told him that it wasn't very bright to leave an alleged weapon that was used nearby.  He then told me "there's no fingerprints on the fucking burner anyhow."  I took this to mean that the weapon that was used had no fingerprints on it.  On March 19, 1999 I contacted a member of the Drug Enforcement Task Force and gave them this information on the telephone. On this same day I gave them this deposition.

Unfortunately for Hendricks the "confession" attributed to Bobbie Hendricks is more inculpatory than exculpatory.  The court charged the jury on accessorial conduct under which either defendant, Robert Hendricks or Bobbie Hendricks, could be found guilty based upon the conduct of the other.[52]  The jury was further charged that, with respect to the four common charges (murder and robbery), the jury could find both defendants guilty provided that they found that *either defendant committed the actual criminal act*.[53]  No objection was made to the jury charges, and Hendricks does not challenge their correctness in his petition before this Court. Thus, there is no "reasonable probability" that a different verdict would have resulted had the "confession" by Bobbie Hendricks that he actually was the person who "capped" the victim been presented to the jury at trial.[54]   Nor can it be said "its suppression undermines confidence in the outcome of the trial."[55]

Under the facts and circumstances of this case, this Court cannot say that the decision of the Oneida County Court, to the extent it addressed the merits, was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

---

[51] Docket 6-20, p. 25.

[52] Docket 6-3, pp. 434–38.

[53] Docket 6-3, pp. 448–50, 452 (emphasis added).

[54] *Strickler v. Greene,* 527 U.S. at 281.

[55] *United States v. Bagley,* 473 U.S. at 678.

of the United States" or  was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[56]  Nor can this Court find that the state court unreasonably applied the correct legal principle to the facts of Hendricks' case within the scope of *Lockyer–Williams*; *i.e.*, the state court decision was more than incorrect or erroneous, its application of clearly established law was objectively unreasonable.

Hendricks is not entitled to relief on his second ground.

Ground 3:  Uncharged Crimes (*Ventimiglia* ).

Hendricks contends that his due process rights were violated when the trial court allowed the testimony of a prosecution witness concerning prior bad acts, i.e., uncharged crimes, without first conducting a hearing as required by New York law under *People v. Ventimiglia*, and the failure to issue appropriate limiting instructions both contemporaneously with the testimony and in its final charge to the jury.

Hendricks complains about the following testimony of the prosecution witness, Melissa Girolamo:[57]

Q:  Now, what happened when you got to — when you got into your apartment?

A:  Robbie — or Robert and Bobbie, they were looking like all panicky and nervous like.

MR. FERRIS:  Objection, your Honor.

THE COURT:  I'll sustain the objection.

Q:  Okay. Can you just tell us what you observed, not your opinion of how they were acting, but tell us what you saw them doing.

A:  I saw Bobbie take off his coat and put on the other coat and Robert — I asked Robert what had happened and then that's when he said he had stuck him.

MR. FERRIS:  I object to this line of questioning. I know what's going to be said and I think it calls for an opinion of the witness.

THE COURT:  Okay. I'll overrule the objection.

Q:  What if anything did — What did you say to Robert at that time?

---

[56] 28 U.S.C. § 2254(d).

[57] Docket 6-3, pp. 126:18–129:5.

A:  I had asked him what had just happened at the bar.

Q:  And what did Robert say to you?

A:  He told me don't worry about it. And when I said, "Don't worry about it?," he told me — I said, "Don't worry about it? I just heard gunshots."  And he was like, "I just stuck him," and that was it.

Q:  Had you ever heard the term "stuck" before, before Robert used it that evening?

A:  Yes, I have.

Q:  Have you ever heard it used on the street?

A:  Yes.

Q:  How many times have you heard that term used on the street?

A:  Several.

Q:  How many times is several?

A:  More than twenty-five.

Q:  Had you ever heard Robert use it before that evening?

A:  Yes, I had.

Q:  How many times had you heard Robert use it?

A:  Two or three.

Q:  When, prior to that evening, had you heard him use it?

A:  When he got somebody.

Q:  Okay.  Now, when you say "when he got somebody," I mean what term does "stuck" — what exactly does "stuck" mean in terms of the street use of it and as Robert was using it?

A:  When you rob someone.

MR. FERRIS:  Objection.

MR. MAGGIO:  Objection.

MR. FERRIS:  Continuing objection to all this, your Honor, please.

THE COURT:  It's overruled.

Q:  You may continue.

A:  When you rob someone, when you steal from somebody, when you cause bodily injury or harm, that's what stuck means.

Q:  And Robert said he stuck him?

A:  Yes.

Q:  Did he say anything else?

A:  No.  They left.

Hendricks raised these issues in his direct appeal.  In rejecting Hendricks' arguments, the Appellate Division held (771 N.Y.S.2d at 440):

> Contrary to defendant's contention, County Court properly allowed a lay witness to testify regarding the meaning of the term "stuck."  "[W]hen words have a doubtful, hidden or ambiguous meaning, the person who used them may testify as to their meaning, as may all persons who heard them" (citations omitted). *  *  *  * Defendant's remaining contentions are not preserved for our review (*see* CPL 470.05[2] ), and we decline to exercise our power to review them as a matter of discretion in the interest of justice (*see* 470.15[6][a] ).

Respondent argues that the issues raised in the petition before this court, although raised in Hendricks' direct appeal, were denied because they were  not preserved for review under N.Y. Criminal Procedure Law § 470.05[2].  The Court agrees.  Under the adequate-and-independent-state-ground doctrine, federal courts may not review the judgment of a state court that "rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision."[58]  Because this doctrine applies on federal habeas review and because the state-law ground may be a procedural bar,[59] federal habeas courts often speak of an "adequate and independent procedural bar" to federal review of a claim or simply of a "procedurally barred" federal claim.  A federal habeas court lacks jurisdiction to evaluate questions of federal law decided by a state court where the state court judgment "rests on a state law ground that is independent of the federal question and adequate to support the judgment."[60] Where a decision "fairly appear[s] to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion," habeas courts presume that there is no adequate and

---

[58] *Harris v. Reed,* 489 U.S. 255, 260 (1989).

[59] *Id.,* at 261-62,

[60] *Coleman v. Thompson,* 501 U.S. 722, 729 (1991).

independent state law ground supporting the judgment.[61]  Finally, "[s]tate courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims."[62]  Accordingly, a procedural bar will be deemed "adequate" only if it is based on a rule that is "firmly established and regularly followed" by the state in question.[63]

The Second Circuit has laid out three clues to follow to classify the decision as either fairly appearing to rest primarily on or interwoven with federal law, or as resting primarily on state procedural law:  (1) the face of the state court opinion; (2) whether the state court was aware of a procedural bar; and (3) the practice of state courts in similar circumstances.[64]  There is no question that the Appellate Division explicitly invoked the state procedural rule as barring review.  Looking behind the asserted state law ground, as the Court must, the Court agrees with Respondent that the procedural grounds cited by the Appellate Division, unpreserved for review, is firmly established and regularly followed by the New York courts.[65]

Even if Hendricks' claim were not procedurally barred, he would not prevail.  The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts."[66]  "The introduction of unfairly prejudicial evidence against a defendant in a criminal trial . . . does not amount to a violation of due process unless the evidence is so extremely unfair that its admission violates fundamental conceptions of justice."[67]  "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules"[68]

---

[61] *Id.* at 735.

[62] *Hathorn v. Lovorn,* 457 U.S. 255, 263 (1982).

[63] *Ford v. Georgia,* 498 U.S. 411, 423-24 (1991).

[64] *Jimenez v. Walker,* 458 F.3d 130, 145 & n.16 (2d Cir. 2006).

[65] *Rhagi v. Artuz,* 309 F.3d 103, 106–07 (2d Cir. 2002)

[66] *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).

[67] *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir. 1998).

[68] *Estelle v. McGuire*, 502 U.S. at 72, quoting *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983).

Federal Rule of Evidence 404(b) generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character, unless that evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge.  No preliminary showing is necessary before such evidence may be introduced for a proper purpose.[69]  If offered for such a proper purpose, the evidence is subject only to general strictures limiting admissibility such as Rules 402 and 403.[70]  The Second Circuit "has long adopted an inclusionary approach to the admission of uncharged crime evidence, under which evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity."[71] Considerable deference is accorded to a district court's decision to admit such evidence, and it is reversed only for abuse of discretion.[72]  In ruling on whether evidence is properly admitted under Rule 404(b), the court must consider whether:  (1) the prior acts evidence is offered for a proper purpose; (2) the evidence is relevant to a disputed issue; (3) the probative value of the prior act evidence substantially outweighs the danger of its unfair prejudice; and (4) if requested, administered an appropriate limiting instruction.[73]

The "bad acts" of which Hendricks complains were elicited in connection with testimony explaining the meaning of the word "stuck" and its use by Hendricks.  As such, they were, as the Appellate Division found, admissible under state (New York) evidentiary rules.  While a limiting instruction may have been the preferable course of action, Hendricks fails to cite and independent research by this Court has failed to find any authority that it is constitutionally mandated, particularly in light of the lack of any request for such an instruction.  Finally, the Court notes that the Supreme Court has specifically declined to reach and has expressed no opinion on the

---

[69] *Huddleston v. United States*, 485 U.S. 681, 687–88 (1988).

[70] *Id.*, at 688.

[71] *United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006) (internal quotation marks and citations omitted).

[72] *Id.*

[73] *Huddleston*, 485 U.S. at 691–92.

question of whether state law would violate due process if it permitted the use of prior crimes or bad acts to show propensity to commit a charged crime.[74]

Accordingly, given the total absence of federal authority that a trial court is obligated to provide a hearing *in limine* or give a limiting instruction on the use of evidence of prior crimes, this Court cannot say that the failure to do so, or the decision of the Appellate Division on the propriety of the testimony, was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[75]

Hendricks is not entitled to relief on his third ground.

## V. CONCLUSION AND ORDER

Hendricks is not entitled to relief on any ground raised in his petition.

**IT IS THEREFORE ORDERED THAT** the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DISMISSED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[76]  To the extent the issues raised in the petition were addressed by the Appellate Division, Fourth Department, or the Oneida County Court, no reasonable jurist could find that the decision was "objectively unreasonable."  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.  *See* Fed. R. App. P. 22(b); Second Circuit R. 22.

The Clerk of the Court to enter final judgment accordingly.

Dated:  November 20, 2008.

s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge

---

[74] *Estelle v. McGuire*, 502 U.S. at 75 n. 5.

[75] 28 U.S.C. § 2254(d); *see Eisemann v. Herbert*, 401 F.3d 102, 110 (2d Cir. 2005);  *McKinney v. Artuz*, 326 F.3d 87, 103 (2d Cir. 2003).

[76] 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) ("reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further") (internal quotation marks omitted).